

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*[signature]*

**Signed July 19, 2007**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| WOOL GROWERS CENTRAL | § | CASE NO. 06-60055-RLJ-11 |
| STORAGE COMPANY, | § | |
| | § | |
| DEBTOR | § | |

### <u>MEMORANDUM OPINION</u>

The Court considers whether to approve the First Amended Plan of Reorganization (the "Plan") of Wool Growers Central Storage Company ("Wool Growers") which contains a provision providing that, in return for a contribution of $2,625,000 by three of its directors, any claims by creditors against the directors are released. The Plan is opposed by creditors Jack David Wardlaw, Jesse Lem Wardlaw, Jack David Wardlaw III, Mack Miers Wardlaw, and William Chase Wardlaw (the "Wardlaw Group"). The confirmation hearing was held on May 3, 2007. This Memorandum Opinion contains the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

## Background

This chapter 11 case was filed on April 28, 2006. Wool Growers is a Texas corporation that has been in business since 1908. It is principally in the business of selling, on a commission basis, wool and mohair that it holds in its storage facilities after delivery by producers of the wool and mohair. According to Wool Growers's disclosure statement, its financial problems, and thus this bankruptcy filing, were caused by the criminal acts of a former warehouse manager, Donnie Laughlin, who has admitted to diverting for his personal use the sales proceeds obtained from the sale of wool and mohair that had been stored with Wool Growers. The claims of producers, who apparently constitute the bulk of the unsecured creditors in this case, exceed $3 million. The Plan is the result of a mediation settlement that was reached among Wool Growers, the members of its board, and the Official Unsecured Creditors' Committee. The mediation was held on December 8, 2006, with retired bankruptcy judge Bill H. Brister serving as the mediator.

The Plan provides that, on its effective date, members of Wool Growers's board of directors – George Bunger, Jr. ("Bunger"), Bill Black ("Black"), and John Allison ("Allison") – shall pay to a disbursing agent the sum of $2,625,000. This payment will be in the form of loans made by the directors to Wool Growers. The funds will be used to make a one-time distribution to the creditors in this case, the first funds used to pay administrative claims, which are estimated to not exceed $150,000, and the balance to be used to pay unsecured creditors. It is anticipated that there will be a distribution of sixty to seventy cents on the dollar, with the remaining unsecured debt to be discharged. The members of Wool Growers's board have agreed that their claims, which they submit are in excess of $517,000, will be subordinated to the claims of unsecured creditors.

The Plan, and the accompanying disclosure statement, identify potential claims against Wool Growers's directors which were settled by the mediation.  In exchange for their contribution of $2,625,000 and their agreement, via the subordination, not to receive payment of any amount on their own claims from this sum, Bunger, Black, and Allison will be released both individually and as board members from any claims and causes of action that might be brought against them by any creditor of Wool Growers.  In addition, to enforce the release, creditors are enjoined from pursuing any such claims or causes of action against Bunger, Black, and/or Allison.[1]  The proposed release is the major point of contention in this case.  In this regard, according to the disclosure statement, both Bunger and Allison have sufficient nonexempt assets to satisfy in full all claims of creditors in this case; Black has sufficient nonexempt assets to pay at least one-third of all claims.

The Wardlaw Group are producers of mohair who owned angora goats that were sheared twice a year to produce mohair that was delivered to Wool Growers for sale. The Wardlaw Group's transactions with Wool Growers were generally as follows:

(1)     Upon delivery by the Wardlaw Group, Wool Growers would store the mohair belonging to the Wardlaw Group for a chance to sell the mohair when and if the mohair market reached a point where the Wardlaw Group wanted to sell.

---

[1]The Plan states as follows:

[U]pon the payment by Messrs. Bunger, Black and Allison of the $2,625,000.00, then Messrs. Bunger, Black and Allison shall be released from any and all claim or claims, cause or causes of action and any liability whatsoever arising out of their service on the Board of Wool Growers, in their individual capacities, or in any other capacity, it being the intention of the Plan that they receive a full, final and complete release of such liability.  The Release shall be evidenced by and specifically referenced in the Court's Order Confirming Plan.  The Release shall be binding on all creditors and parties in interest, whether or not they filed a claim in this case, and the Court shall be requested in the Plan to, in its Order Confirming Plan, enjoin all creditors and parties-in-interest from attempting in any way to further collect from the Board members, individually, the balances due on their claims.

(2)     When the market reached a point where the Wardlaw Group wanted to sell their mohair, the Wardlaw Group would then, as per their right, instruct Wool Growers to sell their mohair in exchange for a commission.

(3)     Wool Growers would receive the entire purchase price of the mohair, deduct its commission and other charges and remit the net proceeds to the Wardlaw Group.

(4)     Wool Growers charged no fee for storage.

(5)     The Wardlaw Group maintained ownership of the mohair until it was sold and was free to take possession of their mohair at any time.

The Wardlaw Group delivered mohair to Wool Growers in the years 1999, 2000, 2001, and 2002. In either the fall of 2005 or January of 2006, the Wardlaw Group made demand that their stored mohair be sold by Wool Growers.[2] As presumably occurred with most of the other unsecured creditors in this case, Wool Growers failed to remit to the Wardlaw Group the sales proceeds for the sale of their mohair thereby giving rise to the claims of the Wardlaw Group in this case. The Wardlaw Group has two claims on file in this case, representing unsecured claims in the aggregate amount of $252,215.45.

The corporate privileges of Wool Growers was forfeited on July 9, 2004, for failure to pay franchise taxes that were due May 15, 2004. The corporate privileges of Wool Growers were not reinstated until April 10, 2006, shortly before the filing of this chapter 11 proceeding.

The Plan has been overwhelmingly approved by the creditors of Wool Growers. The Plan provides for seven classes of creditors. In Class One, the administrative expense category, no ballots were cast. In Class Two, which consists of priority tax claims, no ballots were cast. In

---

[2]The evidence is conflicting on when the Wardlaw Group actually demanded that their mohair be sold. The Wardlaw Group states that they made demand in January, 2006. Wool Growers, through information obtained from members of the board and representatives of the Official Unsecured Creditors' Committee, submits that the Wardlaw Group's demand occurred some time in the fall of 2005.

Class Three, of which Ford Motor Credit is the sole creditor, no ballot was cast. In Class Four, which consists of so-labeled trade creditors, eleven creditors holding claims totaling $185,909.98 cast ballots on the Plan, with all creditors voting to accept the Plan. In Class Five, which is the major group of creditors in the case, consisting of producer claimants, sixty-eight creditors holding claims in the amount of $3,644,336.40 cast ballots on the Plan. Of that amount, sixty-six creditors holding claims totaling $3,392,120.95 accepted the Plan. Two creditors, which represent the two claims filed by the Wardlaw Group, holding claims totaling $252,215.45, rejected the Plan. Of the creditors casting ballots in Class Six, eight creditors who would be considered "insiders" and holding claims totaling $517,009.11 cast ballots accepting the Plan. In Class Seven, consisting of equity interest holders, twenty-eight shareholders cast ballots on the Plan with twenty-seven voting to accept the Plan and one shareholder rejecting the Plan.

## Discussion

### Jurisdiction and Whether Dispute is Core or Non-Core

The issue before the Court is whether the Plan, containing the release of claims against Bunger, Black, and Allison, can be confirmed over the Wardlaw Group's objection. As the issue has been presented by Wool Growers and the Wardlaw Group within the context of a plan confirmation under chapter 11 of the Bankruptcy Code, the Court infers that the parties consent to the Court deciding the issue. The Court mentions such inference as, in the Court's view, the question of whether a third-party release is allowable raises the threshold question of whether the Court *can* decide the issue before it. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 751 (5th Cir. 1995). A discussion of the Court's jurisdiction and the nature of the proceeding, i.e., core or non-core, is necessary.

The federal district courts have jurisdiction of all civil proceedings arising under title 11, and all proceedings arising in or related to cases under title 11. 28 U.S.C. § 1334. Such proceedings are, in accordance with 28 U.S.C. § 157(a), referred to the bankruptcy courts. *See also* Miscellaneous Rule No. 33, Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc issued by the United States District Court for the Northern District of Texas. In *Celotex Corp. v. Edwards*, the Supreme Court stated that Congress intended for bankruptcy courts to hear any proceeding that would allow for efficient administration of the bankruptcy case. *See* 514 U.S. 300, 308 (1995). The "related to" language allows for bankruptcy courts to hear more than just proceedings that deal with the "property of the debtor or the estate." *Id*. However, the language does not make the bankruptcy court's jurisdiction limitless. *Id*. Courts interpret related-to jurisdiction to mean that the outcome of a proceeding "'could conceivably have any effect on the estate being administered in bankruptcy.'" *Wood v. Wood* (*In re Wood*), 825 F.2d 90, 93 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (adopting the related to test set forth by the Third Circuit). Furthermore, "[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities . . . and which in any way impacts the handling and administration of the bankrupt estate." *Celotex*, 514 U.S. at 308 n. 6. The Fifth Circuit further delineated the bankruptcy court's jurisdiction when it stated that "it is the relation of the dispute to estate, and not of party to estate, that establishes jurisdiction." *In re Zale Corp.*, 62 F.3d 746, 755 (quoting *Elscint, Inc. v. First Wis. Fin. Corp.* (*In re Xonics*), 813 F.2d 127, 131(7th Cir. 1987)) (holding that third-party tort claims were outside bankruptcy court's jurisdiction because the claims were not property of the estate and had no effect on the estate; however, also holding that third-party contract claims did have an effect on the estate).

Therefore, third-party actions that affect the bankruptcy estate meet the related-to jurisdiction requirement. *See Celotex*, 514 U.S. at 308 n. 5.

Section 157(b)(1) of title 28 provides that a bankruptcy judge may *hear and determine* a *core* proceeding under title 11 (and enter appropriate orders and judgments). If the proceeding is deemed to be non-core but is otherwise related to a case under title 11, the bankruptcy court may *hear* the proceeding and *submit* proposed findings of fact and conclusions of law to the district court for a de novo review and entry of a final order or judgment. 28 U.S.C. § 157(c)(1). This provision implies that a "related to" proceeding must be non-core, as well. Despite this, release provisions within a plan of organization have been found to constitute a core proceeding under section 157(b) because the matter arises in a plan confirmation hearing. *See In re Seatco, Inc.*, 259 B.R. 279, 282 (Bankr. N.D. Tex. 2001).

The Court must be satisfied that the dispute before it meets, at a minimum, the "related to" standard of jurisdiction. A plan proponent cannot, in effect, bootstrap jurisdiction by placing an issue before the bankruptcy court through a specific plan provision.

The Court clearly has jurisdiction here because the directors' potential liability to the creditors of Wool Growers is "related to" the bankruptcy case. *See Celotex*, 514 U.S. at 305. Recovery from the directors of any amount for the creditors' claims potentially decreases Wool Growers's liability. *See id.* at 308 n. 6. The question, then, is whether the Court's clear "related to" jurisdiction becomes something more – arising-under-or-in jurisdiction – by placement of the release provision in the chapter 11 plan. *See In re Seatco*, 259 B.R. at 282. This question becomes academic because, as stated above, the parties have consented to this Court both hearing and deciding the issue before it. The Court is satisfied that it has jurisdiction and that it

-7-

may both hear and decide the case and the issue before it.

<u>Nondebtor Releases – Generally</u>

Section 1129 of the Bankruptcy Code sets forth the requirements of plan confirmation. The release provision implicates basic plan requirements.  First, section 1129(a)(1) and (2)  states that the plan and the plan proponent must comply with the applicable provisions of the Bankruptcy Code.  Subsection (a)(3) states that the plan must be proposed in good faith and not by any means forbidden by law.  11 U.S.C. § 1129(a)(3).  The Bankruptcy Code grants the bankruptcy court power to confirm a plan that modifies a creditor's claim.  *United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); 11 U.S.C. §§ 1123(b)(5), 1129(a)(1).  A bankruptcy court may also approve a plan with "any other appropriate provision not inconsistent with the applicable provisions of [title 11]."  § 1123(b)(6).  Additionally, the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  § 105(a).  These provisions have been interpreted to give broad authority to the court to modify the debtor-creditor relationship by court order or confirmation of a plan of reorganization.  *Energy Res. Co.*, 495 U.S. at 549 (holding that the court could designate how payments to the IRS were to be applied even though this shifted the risk of plan failure to the IRS).

While the bankruptcy court may, through plan approval, modify the debtor-creditor relationship, the circuits are split regarding the bankruptcy court's power to approve a nondebtor release that, in effect, modifies the relationship between a creditor and a nondebtor third-party.[3]

_____

[3]Decisions granting nondebtor releases include: *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 985 (1st Cir. 1995); *SEC v. Drexel Burnham Lambert Group, Inc.* (*In re Drexel Burnham Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir. 1992); *In re Am. Family Enters.*, 256 B.R. 377, 408 (D.N.J. 2000); *In re Master Mortgage Invest. Fund,*

The courts differ in how broadly or narrowly they interpret section 105(a). *See* Joshua M.

Silverstein, *Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate

over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 Emory Bankr. Dev. J. 13, 44-90

(2006) (stating that the pro-release courts interpret section105 broadly, while the anti-release

courts interpret section 105 narrowly). Furthermore, a court's interpretation of section 524(e) of

the Bankruptcy Code plays a significant role as to whether or not the court will approve a

nondebtor release. *See id.* Section 524(e) states that "discharge of a debt of the debtor does not

affect the liability of any other entity on . . . such debt." The anti-release courts interpret section

524(e) as expressly prohibiting nondebtor releases, while the pro-release courts believe the

opposite to be true. *See* Silverstein, *supra* at 42-44. There are two main types of nondebtor

releases: consensual nondebtor releases and non-consensual nondebtor releases.

(1)  Consensual Nondebtor Releases

Most courts allow consensual nondebtor releases to be included in a plan. *Id*. at 25. "The

validity of a consensual release is primarily a question of contract law because such releases are

'no different from any other settlement or contract.'" *Id*. (quoting *In re Arrowmill Dev. Corp.*,

211 B.R. 497, 506 (Bankr. D.N.J. 1997)). While the Fifth Circuit has not specifically addressed

whether a consensual release violates section 524(e), it has reviewed a nondebtor release and

whether *res judicata* applied to defeat a collateral attack of an order confirming a plan that

---

*Inc.*, 168 B.R. 930, 934-37 (Bankr. W.D. Mo. 1994); *In re Transit Group, Inc.*, 286 B.R. 811, 815-18 (Bankr. M.D. Fla. 2002); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 685 (Bankr. D.D.C. 1992).

Decisions rejecting nondebtor releases include: *In re Boston Harbor Marina Co.*, 157 B.R. 726, 729-31 (Bankr. D. Mass. 1993); *In re Texaco, Inc.*, 84 B.R. 893, 900 (Bankr. S.D.N.Y. 1988); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 500, 504-06 (Bankr. D.N.J. 1997); *Feld v. Zale.*

contains a release of a third-party guaranty. *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist.* (*In re Applewood Chair Co.*), 203 F.3d 914, 919 (5th Cir. 2000); *see also FOM Puerto Rico v. Dr. Barnes' Eyecenter, Inc.*, No. 3:05-CV-00333-R, 2006 WL 228982, at *4 (N.D. Tex. 2006). In *Shoaf*, the Fifth Circuit stated that section 524 does not explicitly prohibit discharge of a guaranty of the debtor's obligation by a third party. 815 F.2d 1046, 1050 (5th Cir. 1987) (statement made in dicta; the case was decided on the doctrine of *res judicata*). The panel stated that the Bankruptcy Code "does not … preclude the discharge of a guaranty when it has been accepted and confirmed as an integral part of a plan of reorganization." *Id*. The language of a release must be specific, however. *In re Applewood Chair Co.*, 203 F.3d at 919. As with *Shoaf*, *In re Applewood Chair Co.* was decided on *res judicata* principles; however, in *In re Applewood Chair Co.*, the court declined to extend the holding of *Shoaf* because the wording of the release in *In re Applewood Chair Co.* was too general. *Id*. The Northern District of Texas followed *Shoaf* when deciding whether or not *res judicata* applied to a release provision in a confirmed plan. *See Dr. Barnes' Eyecenter*, 2006 WL 228982, at *4. The district court applied *Shoaf*, stating that the confirmed release was specific, was integral to the plan, was a condition of the settlement, and provided that the released parties gave consideration for the release. *Id*. Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e). *See Shoaf*, 815 F.2d at 1050; *Dr. Barnes' Eyecenter*, 2006 WL 228982, at *4.

    (2) Non-consensual Nondebtor Releases

    The Fifth Circuit has held that a nondebtor release violates section 524(e) when the

affected creditor timely objects to the provision. *See In re Zale Corp.*, 62 F.3d at 761; *see also In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 116 (Bankr. N.D. Tex. 2002) (holding that a plan that releases a nondebtor could not be confirmed over creditor objections); *In re B.W. Alpha, Inc.*, 89 B.R. 592, 595 (Bankr. N.D. Tex. 1988) (same). In *In re Zale Corp.*, the Fifth Circuit stated that "[s]ection 524 prohibits the discharge of debts of nondebtors." 62 F.3d at 760. The court further stated that "the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its *own* liability to the creditor. *Id.* (emphasis added). The court reasoned that "such a permanent injunction improperly insulate[s] nondebtors in violation of section 524(e), [and] it does so without any countervailing justification of debtor protection." *Id*.

The *Zale* case is unique because the release sought involved nondebtors and non-creditors. *Id*. at 751. Some of Zale's directors and Zale's insurance provider, CIGNA, agreed to a settlement arrangement so long as the directors and CIGNA were released from liability against third parties. *Id.* at 749-50. Feld, one of the directors not a party to the settlement agreement, and National Union Fire Insurance Company (NUFIC) objected to the settlement because it released their claims against CIGNA. *Id.* at 749. The Fifth Circuit held that section 524 prohibited the release of nondebtors "because the permanent injunction as entered improperly discharged a potential debt of CIGNA, a nondebtor." *Id.* at 761. Therefore, the court determined that the bankruptcy court overstepped its powers under section 105. *Id.* at 761. While the Zale court appears to have closed the door on non-consensual nondebtor releases, the Fifth Circuit, in dicta, acknowledged that other courts have granted non-consensual nondebtor releases. *In re Zale Corp.*, 62 F.3d at 760. In addressing such cases, the court stated, "the courts upheld

-11-

permanent injunctions of third-party claims because while the injunction permanently enjoined the lawsuits, it also channeled those claims to allow recovery from separate assets and thereby avoided discharging the nondebtor." *Id*. (citing *S.E.C. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir. 1992) (approving settlement that excluded class from sharing in recovery because class would receive fair amount from other funds)). The Fifth Circuit noted that the injunction in *Zale* did not provide Feld and NUFIC with another method of collecting on its claim. *Id.* at 761.

This Court, the bankruptcy court for the Northern District of Texas (Judge John C. Akard, presiding), in a decision that predates *Zale*, reached a result that is consistent with *Zale*. In *In re B.W. Alpha, Inc.*, the court said "it could not have confirmed the Plan with release of the guarantor as part of its terms over the Bank's objection." 89 B.R. at 595. The court held that "[t]he Bankruptcy Code does not provide for discharge of guarantors' obligations." *Id*. The court further stated that section 524(e) reserves the creditor's right to seek recovery from guarantors. *Id*. In *In re Bernhard Steiner Pianos USA, Inc.*, another opinion from the Northern District of Texas, the court followed both *Shoaf* and *In re Zale* by stating that a plan that has been objected to by a creditor cannot be confirmed containing a nondebtor release and that "post-confirmation permanent injunctions that effectively release a nondebtor from liability are prohibited." 292 B.R. 109, 116 (Bankr. N.D. Tex. 2002) (Judge Harlin D. Hale, presiding).

Some courts have allowed non-consensual nondebtor releases provided certain factors were satisfied. *See In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 934 (W.D. Mo. 1994). In *In re Master Mortgage*, the court identified the factors as follows: (1) identity of interest between the debtor and the third-party, (2) substantial contribution of assets to reorganization, (3)

-12-

release is necessary to the reorganization, (4) majority of affected creditors have overwhelmingly accepted plan treatment, and (5) plan provides payment of all, or substantially all, of affected classes' claims. *Id*. at 935. For the first factor, most courts look to whether or not indemnity or contribution exists between the debtor and third party. *Id*. Substantial contribution, the second factor, has included cash, insurance proceeds, subordination of claims, and forfeiture of claims. *Id*. Factor three looks at whether or not the release is necessary because without the release the reorganization would not happen. *Id*. Most courts have held that factor four is satisfied when over ninety percent of the impacted creditors approve the plan. As for the fifth factor, most courts have held that full payment is necessary. *Id*. The factors do not all have to be present to approve the non-consensual nondebtor release; the courts have generally balanced the factors, looking at the specific facts in each case. *Id*.

<u>Release Before the Court</u>

The Court now turns to the facts and circumstances of the instant case and whether the release should be allowed. In deciding this issue, the Court notes first that the Bankruptcy Code does not explicitly authorize a plan proponent – whether the debtor-in-possession, a creditor, or a creditors' committee – to provide for a release or discharge of valid creditor claims against a nondebtor third-party. Neither section 105 of the Bankruptcy Code nor the potentially applicable chapter 11 provisions, sections 1123(a)(5) and 1129(a)(1), can be so construed; section 524(e) simply states that the discharge of a debt of the debtor does not affect the liability of any other party on the discharged debt. While section 524(e) does not explicitly prohibit a third-party discharge, it certainly does not sanction a third-party discharge. With respect to the factor-driven approach set forth in *In re Master Mortgage*, Wool Growers satisfies the first four factors. The

-13-

fifth factor, full or almost full payment of the affected claims, is not satisfied. While the court in *In re Master Mortgage* states that all factors need not be satisfied to approve a non-consensual nondebtor release, the Court is of the opinion that the fifth factor is critical for approval, at least under the facts and circumstances of the present case. A release that, in effect, channels the creditors' recovery to a source other than the debtor, may indeed satisfy this fifth factor, but such a channeling release has not been proposed here. Instead, the Wardlaw Group, if forced to accept the plan with the proposed release, will recover, at best, sixty to seventy percent of their claims. What they are forced to give up is not insignificant. Wool Growers and the Creditors' Committee are, in effect, arguing that a super majority must override vested state law rights without explicit authority under the Bankruptcy Code to justify such position. While the Court acknowledges the significance of the proposed contribution by the three directors, it finds no authority that allows it to approve the release in this case.

Whether Released Claims Belong to Estate

At the confirmation hearing, counsel for the Creditors' Committee argued, for the first time, that the claims of the Wardlaw Group belong to the bankruptcy estate. This argument is contrary to the position taken by Wool Growers and the Creditors' Committee in the first amended disclosure statement, as supplemented, which was, in turn, approved by the Court. The supplement to the disclosure statement incorporates a memorandum prepared by the Creditors' Committee that sets forth an analysis of the proposed mediation settlement. The memorandum states that, upon examination having been made, claims exist against the "management of Wool Growers" and the board of directors for gross negligence, mismanagement, and breach of fiduciary obligations. In addition, the memorandum states that the "forfeiture of the corporate

-14-

charter of Wool Growers could cause the individual members of the Board of Directors to be jointly and severally liable for all of the losses that occurred during the period of time the charter was revoked."  Suppl. to Disclosure Statement Memo to Creditors p. 2.  The memorandum then states as follows:

> The attorneys advise us that the strongest causes of action do not belong to the creditors themselves.  Rather, the causes relating to gross negligence and breach of fiduciary duties are claims that belong to the Debtor Corporation itself. . . .
>
> There is one cause of action, however, that would belong to the creditors.  This cause of action arises as a result of the forfeiture of the corporate charter.  It is clear the charter of Wool Growers was forfeited from July 9, 2004, until April 10, 2006.  This is the period when many of the funds were taken and improperly used.  In such a situation, the members of a corporate board are jointly and severally [liable] for all claims incurred during this period so long as the liability arises during the period when the charter is forfeited.  The problem though is that some of the creditors claims might have arisen during this period and some of them might not have.  For example, the records of the Debtor Corporation with respect to sales of wool and mohair are so bad it is difficult to know which producers' product was sold and at what time.  You might get into a situation where individual creditors had liability against the Board and others do not.  Furthermore, the law makes the directors liable for claims that arose during the period of the forfeiture.

*Id*. at p. 4.[4]  The Court assumes that the Wardlaw Group, specifically its counsel, was surprised

---

[4]A second memorandum, prepared by the directors of Wool Growers, is also included with the Supplement to the Wool Growers's disclosure statement.  This directors' memorandum disputes the conclusions of the Creditors' Committee regarding the directors' potential liability to creditors.  It states, in pertinent part, as follows:

> The issue of personal liability for certain debts created or incurred by the corporation during the period of time that the corporate franchise was revoked is not an absolute.  Under the language of the statute in question, the debt must be "...created or incurred...after the date on which the report, tax, or penalty is due and before the corporate privileges are revived....", Section 171.255(a) V.T.C.A. Tax Code.  Several Texas cases which have ruled on the correct interpretation of this portion of the statute have held that it is the date the contract was entered into which establishes when the debt was created or incurred and not the date that the damage may have occurred (the date the contract was breached).  If that is the case, all debts created or incurred would be established by the date the wool or mohair was left with WGCSC and not the date it was sold.  Any wool or mohair delivered to WGCSC before the date of forfeiture (July 9, 2004) would not be a debt for which the officers or directors were personally liable, if other conditions of the statute do not relieve them of liability.  The Directors will defend any suits against them individually for personal liability under this statute and on any other theories set forth by the Creditors' Committee in their summary.

and perhaps even confused by the Committee's argument at the confirmation hearing. The Wardlaw Group's objection to the plan and, specifically, the release provision is premised solely on its claim that the directors are liable to them because of the forfeiture of Wool Growers's corporate charter. Their argument is as follows: the Wardlaw Group was not paid for their product, a breach of contract claim, and the directors are liable because the charter of Wool Growers had been forfeited at the time the claim arose.

Once a debtor files for bankruptcy, the Bankruptcy Code creates an estate that embodies all of the debtor's property as identified under section 541 of the Bankruptcy Code. 11 U.S.C. § 541. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id*. Courts have broadly defined the term "all legal or equitable interests" to include causes of action. *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright* (*Matter of Educators Group Health Trust*), 25 F.3d 1281, 1283 (5th Cir. 1994). "If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim." *Id.* at 1284. However, when "a cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action." *Id*. The Court looks to state law to determine which causes of action belong to the estate and which belong to the creditors. *Id*. This inquiry requires a determination as to whether or not the debtor could have brought the claim as of the commencement of the case. *Id*. In addition, the inquiry includes determining the "nature of the injury for which relief is sought." *Id*. "'[I]njury characterization analysis should be considered as an inseparable component of whether an action belongs to the [estate] or individual.'" *In re Schimmelpenninck*, 183 F.3d 347, 359 (5th Cir. 1999) (quoting *In re Hutton Sw. Prop. II, Ltd.*, 103 B.R. 808, 812 (Bankr. N.D. Tex. 1989)). When the conduct giving rise to a cause of action

-16-

indirectly harms the creditor, and the debtor could have raised the claim before the commencement of the case, then the cause of action belongs to the estate. *Matter of Educators Group Health Trust*, 25 F.3d at 1284. On the other hand, when the cause of action does not directly harm the debtor, precluding the debtor from bringing the cause of action before the commencement of the case, then the cause of action belongs to the creditor. *Id.* Nonetheless, the Fifth Circuit has held that the trustee may bring creditors' claims when the claim is a general grievance:

> If the right belongs to the debtor's creditors, the distinction between personal and general claims takes on significance: A trustee can assert the general claims of creditors, but is precluded from asserting those creditor claims that are personal. In other words, even if a claim "belongs to" the creditor, the trustee is the proper party to assert the claim, for the benefit of all creditors, provided the claim advances a generalized grievance.

*In re Schimmelpenninck*, 183 F.3d at 359. In *In re Schimmelpenninck*, the Fifth Circuit identified three categories of causes of action in determining whether or not they belong to the estate or the creditors individually: (1) "[a]ctions by the estate that belong to the estate," e.g., causes of action based on negligence or breach of fiduciary duties, *see Matters of Educators Group Health Trust*, 25 F.3d at 1284-85; (2) "[a]ctions by individual creditors asserting a generalized injury to the debtor's estate, which ultimately affects all creditors," e.g., alter ego theories of liability, *see In re Schimmelpenninck*, 183 F.3d at 361; and (3) "[a]ctions by individual creditors that affect only that creditor personally," e.g., claims for fraud or other statutory causes of action, *see Matters of Educators Group Health Trust*, 25 F.3d at 1286. *In re Schimmelpenninck*, 183 F.3d at 360.

Under state law, claims of negligence on the part of directors or breach of fiduciary duties belong to the corporation. *See Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 628 (Tex.

Civ. App.—Houston [14th Dist.] 1973, no writ.).

> It is a basic rule of law that officers and directors of a corporation owe to it duties of care and loyalty. … Such duties, however, are owed to the corporation and not to creditors of the corporation. I[n] ordinary circumstances where an officer or director negligently mismanages corporate business to its injury … a cause of action in behalf of the corporation arises…. Such breaches of duty neither create a cause of action in a creditor of the corporation for the wrong done the corporation nor, without more, entitle the creditor to collect his claim from the officers and directors.

*Id*. The Creditors' Committee here correctly stated that any causes of action for gross negligence and/or breach of fiduciary duties against the directors belong to the bankruptcy estate. *See Matters of Educators Group Health Trust*, 25 F.3d at 1284. Therefore, the trustee is the proper party to bring the cause of action, or, as was done, settle the claim with the directors.

The Court concludes that the Creditors' Committee was correct, as well, when it characterized claims arising during forfeiture of Wool Growers's charter as belonging to creditors. Under state statutory law, directors and officers of a corporation whose corporate charter was forfeited for failure to pay franchise taxes are liable for the corporation's debts that arose during the time of forfeiture. Tex. Tax Code Ann. § 171.255 (Vernon 2002). "The liability of a director or officer is in the same manner and to the same extent as if the director or officer were a partner and the corporation were a partnership." *Id*. The Wardlaw Group asserts a claim for breach of contract, a contract that they contend was entered into in January 2006. Obj. Debtor's First Am. Plan p. 3. If the Wardlaw Group is correct, the directors are liable for the breach of contract because the debt arose during the time that Wool Growers's corporate charter was forfeited. *See* § 171.255. The breach injures the Wardlaw Group, not Wool Growers, and Wool Growers held no breach of contract claim either before or after it filed bankruptcy. *See Matters of Educators Group Health Trust*, 25 F.3d at 1284 (noting that a cause of action held by

-18-

the estate could have been brought by the debtor prior to commencement of the bankruptcy case).  Therefore, the claim belongs to the Wardlaw Group and not the bankruptcy estate.  *See Matters of Educators Group Health Trust*, 25 F.3d at 1284.[5]

Finally, the Court notes that the Creditors' Committee, as noted above, admitted that the creditors hold separate individual claims for debts that arose during the forfeiture of the corporate charter.  The Court, in considering the Creditors' Committee's argument at the confirmation hearing relative to its position at the disclosure statement phase, believes the Committee should be prevented from arguing a position contrary to that taken in the disclosure statement.  The Court implicitly accepted the Committee's prior position by approving the disclosure statement. The disclosures set forth in the supplement to the disclosure statement did not reserve an alternative position, i.e., the position taken at the confirmation hearing.  Equity and fairness dictate that the Committee's argument made at the confirmation hearing on this point be disallowed.

## Conclusion

The Court concludes that the release provision here prevents the Court from confirming Wool Growers's plan.  The Court finds no authority in the Bankruptcy Code or in case law that

---

[5]The Court recognizes that an analysis of whether the Wardlaw Group's claim belongs to the bankruptcy estate has certain similarities to the analysis of whether an alter ego claim belongs to the bankruptcy estate.  An alter ego claim has been characterized as remedial – i.e., as a means to collect against a third-party (a control person, for example) for a debt that arose under a substantive cause of action (a contract claim, for example).  Similarly, the substantive claim made by the Wardlaw Group is based on a breach of contract claim with the Texas Tax Code providing a remedy because of the corporation's failure to maintain its corporate existence.  The breach of contract claim in both instances clearly belongs to the creditor and is not assertable by the debtor.  But the Fifth Circuit in *Matter of S.I. Acquisition, Inc.*, concluded that an alter ego claim is a "right of action" belonging to the debtor and, as such, is property of the estate within the meaning of section 541(a)(1) of the Bankruptcy Code.  817 F.2d 1142 (5th Cir. 1987).  The Court notes, however, that the nature of the conduct giving rise to an alter ego claim is very different than the conduct (or lack of conduct) that causes the forfeiture of a corporate charter.

allows the Court to construe the release provision as complying with any applicable provisions of the Bankruptcy Code. The Plan fails to meet the standards of section 1129(a)(1) and (2) of the Bankruptcy Code. The Court will enter its order denying confirmation.

### End of Memorandum Opinion ###